# McDermott Will & Emery

Boston  Brussels  Chicago  Dallas  Düsseldorf  Frankfurt  Houston  London  Los Angeles  Miami
Milan  Munich  New York  Orange County  Paris  Seoul  Silicon Valley  Washington, D.C.

Strategic alliance with MWE China Law Offices (Shanghai)

Robert W. Zelnick
Attorney at Law
rzelnick@mwe.com
+1 202 756 8377

April 18, 2018

Honorable Donna M. Ryu
United States Magistrate Judge
1301 Clay Street,
Oakland, CA 94612

   Re: *Estate of Thelonious Sphere Monk v. North Coast Brewing Company, Inc.*
     **Case No. 4:17-CV-05015 HSG (DMR)**

Dear Magistrate Judge Ryu:

As instructed in ECF No. 74, this letter supplements ECF Nos. 59 and 67. The parties appreciate the Court's guidance on April 11, but, unfortunately, material disputes remain. Here is a brief summary of North Coast's *substantial* efforts to secure answers to North Coast's 83 Admission Requests ("RFA") served on February 7, 2018:

- March 5 (4 days before RFA answers were due): Monk's counsel advised that Monk would seek a protective order from answering *any* of North Coast's 83 RFAs.
- March 5 (two hours later): North Coast requested a meet and confer on March 7.
- March 7: "Meet and confer" (if it could be called that) lasted for less than 15 minutes. Monk's counsel was 4 minutes late to the call, and therefore engaged in active discussion for only about 11 minutes. After first discussing 3 unrelated topics in the litigation, the discussion of North Coast's 83 RFAs comprised approximately *3 minutes*.[1] Despite repeated requests, Monk refused to discuss **any individual RFAs**, insisting instead that all were objectionable because they were "too early" in the case and improperly sought facts.
- March 7 (3 hours later): North Coast sent detailed 6-page letter, expressing deep concern about the 3-minute meet and confer, and urging a continued one; documenting that Monk was repeatedly unwilling to discuss *any* individual RFAs; recounting Monk's counsel's "improper purpose" for the refusal to answer *any* RFA (*i.e.*, not before mediation); and reiterating that North Coast would seek redress if the RFAs were not answered.
- After North Coast's March 7 letter: *Monk never responded to or refuted North Coast's 6-page letter*, and did not agree to a further meet and confer until the Court's guidance last week.
- March 9: Monk filed joint discovery letter seeking protective order on all RFAs. Monk simultaneously filed a 96-page objection to 82 of North Coast's 83 RFAs.
- March 21: Monk reiterated refusal to answer 82 of 83 RFAs or produce documents that reflected what Monk consulted (as alleged "reasonable inquiry) in preparing responses to the RFAs[2].
- March 22: North Coast again *twice* implored Monk, in writing, to answer the RFAs.
- March 27: At the Monk 30(b)(6) deposition, Monk's counsel instructed Monk not to answer questions about documents consulted in connection with responding to RFAs (*see* n.2, *supra*).
- April 11: North Coast requested continued meet and confer, per the Court's guidance.
- April 12: North Coast sent detailed letter offering to withdraw RFAs 53, 63, 80, 81 and

---

[1] Monk's counsel does not and cannot dispute this, as phone records would verify it.
[2] *See, e.g., San Diego Unified Port District v. Nat. U. Fire Ins. Co.*, 2017 WL 3877730 (S.D. Cal. 2017) (calling such RFAs "standard").

- 82 and Document Request ("DR") 36; and proposing, *inter alia*, a new shorter/simpler definition of Quality Control ("QC").[3]
- April 13:  Meet and confer held on 82 RFAs and DRs 3, 29 and 36.  Monk still refused to answer RFAs on QC because revised definition has 3 parts.  As a further compromise, North Coast offered to accept answers to 1/3 of the RFAs on QC.  Monk advised that it would supplement answers on remaining RFAs.  Monk promised to revert on April 16 re the offer, but did not.
- April 13 (less than 2 hours after meet/confer):  North Coast sent confirming letter, reiterating offer that Monk could answer 1/3 RFAs on QC with the substantially simpler definition provided, and confirmed withdrawal of RFAs 53, 63, 80, 82 and 82.
- April 16:  Monk served "first amended" responses to the RFAs.  Monk objected in whole or in part to answering **all but 14** of North Coast's remaining RFAs.
- April 17:  Parties agreed to further meet and confer.
- April 18:  Further meet and confer held, but Monk still refuses to answer at least 24 RFAs in Monk's "Second Amended" RFA responses.  (*See* Ex. 1 hereto).

A few highlights of what Monk *still* refuses to admit today – 10 weeks after the RFAs were served:

- 1 of the 8 "compromise" RFAs on QC, with the simpler definition (*see* RFA response 25).[4]
- Admissions re the length and manner of Monk's consent to North Coast's use of the Accused Image (RFA responses 36-42) (*see also* FAC, ¶ 37: "Some time prior to January 11, 2016," Monk consented to North Coast's use);
- The facts and conditions regarding consent that Monk granted (RFA responses 43-45)[5];
- The fact that Monk never objected over 11 years from 2006 until at least 2016 to North Coast's use of North Coast's brand or the Accused Image (RFA responses 46-51);
- The fact that Monk has never acknowledged tax liability[6] in connection with North

---

[3] Specifically referencing *Freecyclesunnyvale v. The Freecycle Network*, 626 F.3d 509 (9th Cir. 2010), North Coast narrowed its definition of QC to "Actions or communications regarding or reflecting Monk's or its designee's <u>right to set, review or enforce standards</u> for North Coast's goods or operations; <u>right to inspect</u> North Coast's goods or operations; and <u>actual establishment, review and enforcement of standards</u> over North Coast's goods or operations."  On April 18, North Coast *unconditionally* agreed to accept this revised definition for all QC RFAs.

[4] North Coast has properly inquired into the factual indications of whether QC exists.  *See Freecycle*, 626 F.3d at 515 ("Trademark owners have the duty to control the quality of their trademarks…. "Naked licensing" occurs when the licensor 'fails to exercise adequate quality control over the licensee…. We have previously declared that naked licensing is 'inherently deceptive and constitutes abandonment of any rights to the trademark by the [purported] licensor.'")

[5] *Cf. Asea, Inc. v. Southern Pac. Trans. Co.*, 33 Fed.R.Serv.2d (9th Cir 1981) ("Response which fails to admit or deny proper [RFA] does not comply with Rule 36 if "information [is] readily attainable"; focus is on full and fair discovery rather than evasion and word play).  *See* ECF No. 59 (quoting substantial social media evidence of Monk's knowledge and encouragement of use).  *Cf. In re TFT, infra* (party cannot be allowed in RFA responses to ignore existing contemporaneous admissions).  Moreover, that Monk has ultimately answered at least 12 of North Coast's original RFAs (*e.g.*, RFAs 1-2, 7-9, 54-55, 67-68, and 77-79) *without any objection or rewording* is further testament to the fact that they should have been answered by March 5.

[6] *See Comm'r v. Sunnen*, 333 U.S. 591, 604 (1948) (The "assignment of the right to receive [IP royalty] income is not enough to insulate the assignor from income tax liability" when "the assignor actually earns the income or is otherwise the source of the right to receive and enjoy the income.")  Thus, whether Monk acknowledged tax liability for "royalty payments" is a factual reflection of whether a "license" or mere "consent" was granted.  (*See* FAC, Ex. 1) (calling North Coast's donations to the Monk Institute at Monk's direction "redirected royalty

- Coast's donations to the Monk Institute (RFA response 56);
- The fact that Monk did not register the rights of publicity asserted in the FAC until August 17, 2017 (*see* RFA response 59; *cf*. FAC at ¶ 23);
- The fact that North Coast never agreed to any amendment of the agreement referenced at ¶ 37 of the FAC (RFP response 64);
- The fact that Monk consented to North Coast's use in exchange for North Coast's contributions to the Monk Institute (*see* RFA response 65; *cf*. FAC para. 37);
- The fact that Monk's grant of consent was not (in Monk's view) the result of fraud, coercion or mistake (*see* response to RFA 70-72; see also North Coast's Affirmative Defense No. 20 (ECF No. 50), re Monk's count for Unjust Enrichment in the FAC.

Monk repeatedly objects that many of these are "ultimate issues." Here, the "ultimate issues" are whether North Coast is an infringer, and whether Monk's IP rights are invalid, which North Coast has not asked.[7]

Monk also repeatedly objects to the definition of "Accused Image" but North Coast merely asks about the images about which Monk complains in the FAC.  Monk's RFA response should identify the images for which Monk admits or denies such RFAs.  Monk also repeatedly objects to the definition of "BROTHER THELONIOUS BRAND." Incredibly, North Coast's definition is ***even narrower than*** the definition of "MONK IMAGE" used in Monk's discovery requests.[8] Monk also improperly objects to other common terms, such as "acknowledgement of tax liability" (RFA 56), "secure a registration" (RFA 59), etc.[9]

To this point, North Coast has expended *literally* tens of thousands of dollars to try to secure answers to its modest 83 RFAs served in early February, and North Coast should be awarded a sanction.  Beyond deeming the above RFAs admitted[10], North Coast respectfully requests reimbursement of its fees and costs since March 7.  Also, discovery closes on June 13, and North Coast needs answers to these RFAs to inform its choice of (limited) interrogatories to serve.  In sum, after objecting to answering ***all*** 83 RFAs, and refusing to participate in more than a **3-minute "meet and confer"** where Monk's counsel refused to discuss ***any individual RFAs***, and immediately thereafter moving for a protective order, Monk cannot be allowed to continue to play this "cat-and-mouse game" at North Coast's expense.[11]

*The Monk Estate's Position: The Disputed RFA's Improperly Seek the Estate to Admit Highly Disputed Legal Conclusions at the Heart of the Parties' Dispute or Broadly Worded Applications of Law to Facts*

**Consent.** The issue of *consent* is central both legally and factually.  Douglas Moody of North Coast showed Thelonious Monk's son (Monk Jr.'s) the label for Brother Thelonious Belgian Style Abbey Ale ("Brother Thelonious") in January of 2006 at the Jazz Educator's Conference in New York City.  Whether Monk Jr.'s approval of that label should be considered the Estate's

---

payments").

[7] Moreover, RFAs can be proper *even when* they go to the true "ultimate issue" in litigation.  *See, e.g., Marchand v. Mercy Medical Center*, 28 Fed.R.Serv.3d 771 (9th Cir. 1994) (in medical malpractice case, RFAs asked the ultimate question of whether doctor failed to meet the required standard of care; affirming award of $205,000 in fees).

[8] Defined by Monk as "[T]rademark Reg. Nos. 3,285,256 and 4,555,981, whether used alone or combined."

[9] *Cf. In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2011 WL 3566419 (N.D. Cal. 2011)(Party "intentionally disregarded the obligations imposed by Rule 36(a)," turning RFA responses into "a mere semantic exercise."  Party must interpret words reasonably in RFAs).

[10] *See Asea, supra* (evasive denial considered an admission; callous disregard of discovery cannot be condoned).

[11] Monk testified at deposition that his counsel has been retained on a 40% contingent fee basis, reflecting that Monk and its counsel have essentially *no out-of-pocket costs* for continuing to play such games.

"consent" as a matter of fact and law for everything that North Coast did thereafter, and whether that "consent" could be withdrawn by the Estate thereafter, are issues at the heart of this case. *See, e.g.,* ECF No. 47, Order Denying Motion to Dismiss, at 2. ("Defendant maintains that its agreement with Plaintiff was a 'mere consent,' rather than a 'trademark license,' and thus 'cannot be withdrawn,' precluding any allegations of infringement. *See* Reply at 2…[T]he Court declines to find at the motion to dismiss stage that Plaintiff could not, as a matter of law, revoke its consent, thus precluding it from making a claim of trademark infringement.  As with likelihood of confusion, the nature of Plaintiff's consent is a fact-intensive inquiry more appropriately resolved on a more fully developed record." See *Hall v. S. Beach Skin Care, Inc.*, No. CV-13-8905 RSWL (PJWx), 2014 WL 1330311, at *4 (C.D. Cal. Apr. 2, 2014) (describing the question of consent in a false endorsement case as requiring the court "to consider evidence – evidence the Court cannot consider on a motion to dismiss").  RFA's 36-45, 65, and 70-72 ask the Estate to admit it "consented," "had consented," "gave consent," "granted consent," or "did not obtain…consent" to North Coast's uses of the Monk name, image and likeness in connection with the sale of Brother Thelonious Ale and associated merchandise. The Estate's objections to these RFA's assert that they call for a legal conclusion, implicate a disputed conclusion of law, broadly apply the law to facts related to consent, and relate to a highly disputed issue at the heart of this case.  These objections are proper and should be sustained.

**Failure to Object.** A species of consent -- whether the Estate failed to object or even encouraged North Coast's use of the Monk name, image or likeness – is another central legal and factual issue.  *See, e.g.*, ECF No. 50, North Coast's Answer and Affirmative Defenses, at 13 ("The FAC, and the claims alleged therein, are barred because The Monk Estate ratified, agreed to, consented to, and acquiesced in, the acts about which it complains in the FAC. For example, for many years The Monk Estate repeatedly encouraged, participated in, ratified, cooperated in and acquiesced in the acts complained-of in the FAC.")   RFA's 46-51 ask the Estate to admit that it "never objected" to North Coast's uses of the Monk name, image and likeness in connection with the sale of Brother Thelonious Ale and associated merchandise, or North Coast's trademark registration for BROTHER THELONIOUS. These RFA's go to the heart of legal issues in the case, and require broad application of facts to law.  *See, e.g.*, ECF No. 22, North Coast's Motion to Dismiss, at 2, 4, 5, 9, and 11-12 (arguing that the Estate was "contractually bound" by the parties' verbal agreement "not to object" to North Coast's use of the Monk name, image and likeness). The Estate's objections to these RFA's assert that they call for a legal conclusion, implicate a disputed conclusion of law, broadly apply the law to facts related to consent, and relate to a highly disputed issue at the heart of this case.  The Estate's objections also assert the lack of a proper predicate since an objection has obvious legal significance depending upon how and to what the objection is asserted, as well as whether the objecting party knew both what was objectionable and that objection was required at some time in the past.  These predicates are lacking making it impossible for the Estate to respond accurately.

**Potential Tax Liability**. RFA 56 mysteriously asks whether the Estate or Monk Jr. "ever acknowledged potential tax liability in relation to NORTH COAST's payments or donations to the MONK INSTITUTE." Gale Monk testified at her deposition that the Estate has never claimed North Coast's donations to the Monk Institute on the Estate's taxes.  (Gale Monk Deposition at 85:19-87:15.)  Neither Mr. Monk Jr. nor Mrs. Monk are tax lawyers or accountants (and neither is their counsel). The Estate honestly does not know what undefined and unexplained "potential tax liability" North Coast is referring to.  Counsel for the Estate has asked counsel for North Coast numerous times for an explanation of what "potential tax liability" the Estate has as a result of North Coast's payments, but none has been provided beyond a vague assertion that the Estate should have claimed North Coast's payments on the Estate's tax returns (which have been produced to North Coast).  It is improper to ask the Estate to admit to something that it does not understand.

**California Registration of Monk Publicity Rights**. The Estate's right of publicity claims are asserted under New Jersey law.  *See* FAC, ECF No. 10, at ¶¶ 68-78.  New Jersey does not have a right of publicity registration scheme like California, but the Estate registered the Monk name, image and likeness in California anyway, and this registration has been produced to North Coast. Despite this, North Coast has persisted in seeking an admission in the negative that the Estate

"did not secure a registration…until August 17, 2017," with the obvious intent of using the fact of a delay between Monk's death in 1982 and the registration for the improper purpose of advancing North Coast's laches argument. *See, e.g.*, ECF No. 50 at 15 ("Without reasonable excuse, The Monk Estate unreasonably delayed in initiating this lawsuit and complaining about the acts complained-of herein, acquiesced in the actions complained-of herein, and prejudiced the rights of North Coast insofar as North Coast devoted resources to, for example, building a business and the BROTHER THELONIOUS Brand in reliance on the consent, action and inaction of The Monk Estate.")  Whether the Estate's registration in 2017 has factual or legal significance as it pertains to North Coast's laches defense (or any other defense) goes to the heart of legal issues between the parties, requires the broad application of facts to law, and is improper.

**No Amendment of the Parties Verbal Agreement.**  North Coast's claimed rights to the Monk name, image and likeness emanate from Monk Jr.'s verbal approval of the Brother Thelonious label in January of 2006 at the Jazz Educator's Conference in New York City.  RFA 64 asks to admit, again in the negative, that "North Coast never agree to any amendment" of the parties' agreement.  The parties' "agreement" is a key issue and hotly contested.  *See* "**Consent**" argument above. What constituted the parties' "agreement," and what either the Estate or North Coast could and could not do under it, are central foci of this case.  The RFA implicates legal conclusions (*e.g.*, what is the agreement, what are its terms, etc.), and facts applicable to those conclusions (*e.g.*, when Monk Jr. did not object to some act by North Coast, was that failure to object tantamount to a concession that no "amendment of the agreement" was necessary to permit North Coast's act?).  The Monk Estate's objections should be sustained.

**Quality Control**. In an email from counsel for North Coast sent Friday, April 13, 2018, North Coast revised its definition of QC to read "Actions or communications reflecting Monk's or its designee's right to set, review or enforce standards for North Coast's goods or operations; right to inspect North Coast's goods or operations; and actual establishment, review and enforcement of standards over North Coast's goods or operations." At the same time, North Coast appeared to withdraw numerous requests 13, 15, 16, 18, 19, 22, 24, 26, 27, 28, 30, 31, 32, 34, 35 addressed to QC.  In response, the Estate answered 12, 14, 17, 20, 21, 23, 29, and 33, but could not answer RFA 25 even with the revised QC definition because it asks the Estate to admit that it "never had a contractual right to exercise" QC. As noted above, what the terms are of parties' contract are, and what the Estate or North Coast could and could not do under it, are key issues and not the proper subject of a request for admission.

On 4/18 North Coast advised the Estate that its prior offer to withdraw requests was a "conditional" offer, the condition being that the Estate must answer **all** of North Coast's requests related to QC.  In other words, unless the Estate agrees to drop all its objections to all QC requests and answer all the QC requests the Estate does not qualify for North Coast's offer.  This "conditional" offer is just the latest of many games counsel for North Coast has played in this case.  The Estate's objections are valid, proper and should be judged on their merits and not part of some horse trading scheme. The games that North Coast's attorneys have played in discovery, not any act or omission on the part of the Estate, are the cause of any delay or attorneys' fees incurred (by both parties).

North Coast's machinations notwithstanding, the Estate has answered the QC requests except for RFA's 24, 25, 26, 27 which ask the Estate to admit that it "never had a contractual right to exercise" QC. The Estate has objected to these for the reasons discussed above, and the Monk Estate's objections to these requests should be sustained.

Respectfully submitted,

*/s/ Robert W. Zelnick*                                                         */s/ Joel B. Rothman*

Robert W. Zelnick                                                              Joel B. Rothman