1   Robert W. Zelnick (*Pro Hac Vice*)
    rzelnick@mwe.com
2   Rebecca Harker Duttry (*Pro Hac Vice*)
    rduttry@mwe.com
3   McDERMOTT WILL & EMERY LLP
    500 North Capitol Street, N.W.
4   Washington, D.C. 20001-1531
    Telephone:   202-756-8000
5   Facsimile:   202-756-8087

6   Jodi L. Benassi (SBN: 309048)
    jbenassi@mwe.com
7   MCDERMOTT WILL & EMERY LLP
    275 Middlefield Road, Suite 100
8   Menlo Park, CA 94025
    Telephone: (650) 815-7400
9   Facsimile: (650) 469-7401

10  Attorneys for *North Coast Brewing Co., Inc.*

11          **IN THE UNITED STATES DISTRICT COURT**

12      **IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

13                  **OAKLAND DIVISION**

14  THELONIOUS SPHERE MONK, JR., as       CASE NO. 4:17-CV-05015 HSG
    Administrator of and on behalf of the
15  ESTATE OF THELONIOUS SPHERE           **DEFENDANT NORTH COAST BREWING
    MONK, Deceased,                       CO., INC.'S NOTICE OF MOTION AND
16                                        MOTION FOR SUMMARY JUDGMENT;
                    Plaintiffs,           MEMORANDUM OF POINTS AND
17                                        AUTHORITIES IN SUPPORT THEREOF**
            v.
18                                        Date: September 6, 2018
    NORTH COAST BREWING CO., INC., a      Time: 2:00 p.m.
19  California Corporation,               Courtroom 2, 4th Floor
20                  Defendant.            **Hon. Haywood S. Gilliam, Jr.**

21

22

23

24

25

26

27

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

### NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE that, pursuant to Fed. R. Civ. P. 56, L.R. 56, and the Court's January 26, 2018 Scheduling Order [ECF No. 45], on September 6, 2018, at 2:00pm, or as soon as the matter may be heard, in Courtroom 2 of this Court, Defendant North Coast Brewing Co., Inc. respectfully moves for summary judgment on all counts of the First Amended Complaint.

No material facts are in dispute, and summary judgment should be entered in full for North Coast. The issues to be decided are: (1) North Coast's use of the accused intellectual property (IP) was via express consent, which was never terminated; (2) Monk is estopped to terminate a consent that it granted a decade earlier without having conducted any quality control over North Coast during that decade; (3) Monk has abandoned any IP rights through failure to conduct any quality control over North Coast for over a decade; (4) any Monk post-mortem right of publicity has expired; (5) Monk acquiesced in the accused acts, and unreasonably delayed, to North Coast's prejudice, in challenging acts that Monk knew of and encouraged for many years; (6) Monk cannot claim unjust enrichment for acts that Monk admitted caused Monk no harm, and that Monk admits actually benefitted Monk; and (7) the statutes of limitation bar Monk's claims.

This motion is based on this Notice of Motion and Motion, the following Memorandum in Support, the Declaration of Robert W. Zelnick filed concurrently herewith and its attached exhibits, all pleadings and papers on file in this action, the briefing filed herein and in opposition hereto, and upon such other evidence as may be properly presented to the Court.

**MCDERMOTT WILL & EMERY LLP**

DATED: August 3, 2018          By:    */s/ Robert W. Zelnick*
                                      Robert W. Zelnick

                                      Attorneys for *North Coast Brewing Co., Inc.*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

# **Table of Contents**

Page

I.   INTRODUCTION ............................................................................... 2

II.  FACTS ............................................................................................. 4

III. ARGUMENT .................................................................................. 10

    A.   Summary Judgment Standard ................................................. 10

    B.   North Coast's Accused Actions Cannot Be Deemed Infringing Because They Were permitted by a Valid Contract Between the Parties .......................... 11

        1.   Monk Consented to North Coast's Use of the Monk Name, Image and Likeness in Connection With Marketing and Distributing BT Ale ............................................................ 11

        2.   Monk Never Terminated the 2006 Contract ............................ 12

        3.   Even if, *Arguendo,* the Complaint Could Constitute Constructive Notice of Termination of the 2006 Oral Agreement, North Coast Ceased the Accused Activities Within a Reasonable Time Thereafter ....................................................... 13

    C.   The Monk Estate's Trademark Infringement Claim Fails As a Matter of Law ............................................................................ 14

        1.   Monk Cannot Claim a Protectable Trademark Ownership Interest Because Monk Failed To Establish or Exercise "Quality Control" Over North Coast for More Than a Decade ........................... 14

        2.   The Statute of Limitations Bars the Trademark Infringement Claims ...... 17

        3.   Monk Failed To Develop any Evidence of Record Regarding Whether North Coast's Use of the Accused BT Brand Constitutes Infringement ................................................... 18

    D.   The Right of Publicity Has Not Been Infringed ................................ 20

        1.   Monk Has No Standing, Because New Jersey Has Not Recognized a Post-Mortem Right of Publicity That Lasts for More Than 30 Years .......................................... 20

        2.   The Accused Uses of Monk's Right of Publicity Were Not Unauthorized ................................................... 21

        3.   Monk Admits That It Suffered No Damages ............................ 21

        4.   The Statute of Limitations Bars Monk's Right of Publicity Claims ........ 22

    E.   The Monk Estate's Unjust Enrichment Claim Fails as a Matter of Law ............. 22

    F.   Monk's Claims Are Barred by Laches ................................................ 24

    G.   Monk Is Estopped To Claim Infringement ......................................... 24

    H.   Monk Admits He Acquiesced to the Accused Conduct ....................... 25

IV.  CONCLUSION ............................................................................... 25

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**MOTION FOR SUMMARY JUDGMENT**
**CASE NO. 4:17-CV-05015 HSG**

# Table of Authorities

Page

**Cases**

*AMF Inc. v. Sleekcraft Boats*
  599 F.2d 341 (9th Cir. 1979)........................................................................ 19

*Anderson v. Liberty Lobby, Inc.*
  477 U.S. 242 (1986).................................................................................. 10

*Applied Info. Scis. Corp. v. eBAY, Inc.*
  511 F.3d 966 (9th Cir. 2007)....................................................................... 14

*Asset Mktg. Sys., Inc. v. Gagnon*
  542 F.3d 748 (9th Cir. 2008)....................................................................... 12

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*
  289 F.3d 589 (9th Cir. 2002)................................................................ 14, 16

*Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*
  688 F. Supp. 2d 940 (N.D. Cal. 2010) ......................................................... 25

*Brennan's Inc. v. Dickie Brennan & Co., Inc.*
  376 F.3d 356 (5th Cir. 2004)....................................................................... 15

*Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.*
  156 F. Supp. 3d 1173 (E.D. Cal. 2016) ....................................................... 20

*Brown v. Kayler*
  273 F.2d 588 (9th Cir. 1959)....................................................................... 24

*Celotex Corp. v. Catrett*
  477 U.S. 317 (1986)............................................................................ 10, 18

*Christoff v. Nestle USA, Inc.*
  213 P.3d 132 (2009)................................................................................ 22

*Croton Watch Co., Inc. v. Laughlin*
  208 F.2d 93 (2d Cir. 1953)......................................................................... 11

*CRV Imperial-Worthington, LP v. Gemini Ins. Co.*
  770 F. Supp.2d 1074 (S.D. Cal. 2010) ........................................................ 23

*Dep't of Parks & Rec. v. Bazaar Del Mundo, Inc.*
  448 F.3d 1118 (9th Cir. 2006)..................................................................... 14

*Douglas v. U.S. Dist. Ct. for the Cent. Dist. of California*
  495 F.3d 1062 (9th Cir.2007)..................................................................... 12

*Downing v. Abercrombie & Fitch*
  265 F.3d 994 (9th Cir. 2001)...................................................................... 18

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

*First Interstate Bancorp v. Stenquist*
   No. C-89-4106, 1990 WL 300321 (N.D. Cal. 1990) ...................................................... 16

*Freecyclesunnyvale v. Freecycle Network*
   626 F.3d 509 (9th Cir. 2010) ................................................................................. 14, 16

*Great W. Distillery Prod. v. John A. Wathen Distillery Co.*
   74 P.2d 745 (1937) ........................................................................................................ 13

*Grupo Gigante S.A. De C.V. v. Dallo & Co.*
   391 F.3d 1088 (9th Cir.2004) ....................................................................................... 24

*High Country Linens, Inc. v. Block*
   No. C 01-02180, 2002 WL 1998272 (N.D. Cal. Aug. 20, 2002) ................................... 11

*Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*
   No. C07-02499, 2009 WL 330259 (N.D. Cal. Feb. 10, 2009) ...................................... 12

*Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*
   559 F.3d 985 (9th Cir. 2009) ........................................................................................ 24

*J.C. Millett Co. v. Park & Tilford Distillers Corp.*
   123 F. Supp. 484 (N.D. Cal. 1954) ............................................................................. 14

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*
   304 F.3d 829 (9th Cir. 2002) ................................................................................. 17, 24

*Kaiser Cement Corp. v. Fischbach and Moore, Inc.*
   793 F.2d 1100 (9th Cir. 1986) ..................................................................................... 10

*Kaltwasser v. Cingular Wireless LLC*
   No. C 07-00411, 2008 WL 3925445 (N.D. Cal. Aug. 22, 2008) ................................. 12

*Network Automation, Inc. v. Hewlett-Packard Co.*
   No. CV 08-4675, 2009 WL 5908719 (C.D. Cal. Sept. 14, 2009) ................................. 19

*Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Ass'n*
   205 Cal. App.3d 1415 (1988) ....................................................................................... 23

*Oracle Am., Inc. v. Hewlett Packard Enter. Co.*
   No. 16-CV-01393, 2017 WL 635291 (N.D. Cal. Feb. 16, 2017) ................................. 11

*Patera v. Citibank, N.A.*
   79 F. Supp. 3d 1074 (N.D. Cal. 2015) ........................................................................ 24

*Pirone v. MacMillan, Inc.*
   894 F.2d 579 (2d Cir. 1990) ........................................................................................ 21

*Prima v. Darden Restaurants, Inc.*
   78 F. Supp. 2d 337 (D.N.J. 2000) ............................................................................... 20

*Rano v. Sipa Press, Inc.*
   987 F.2d 580 (9th Cir. 1993) ....................................................................................... 11

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

**MOTION FOR SUMMARY JUDGMENT**
**CASE NO. 4:17-CV-05015 HSG**

*Reade v. CitiMortgage, Inc.*
 No. 13CV404, 2013 WL 5964611 (S.D. Cal. Nov. 7, 2013)......................................... 23

*Sapiro v. Musicians' Union of San Francisco, Local No. 6*
 No. C-87-850, 1987 WL 58071 (N.D. Cal. Dec. 21, 1987)......................................... 12

*Savetsky v. Pre-Paid Legal Servs., Inc.*
 No. 14-03514, 2015 WL 4593744 (N.D. Cal. July 30, 2015)....................................... 12

*Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc.*
 621 F.3d 981 (9th Cir. 2010) ..................................................................................... 25

*Serafin v. Balco Properties Ltd., LLC*
 235 Cal. App. 4th 165 (2015) .................................................................................... 13

*Strick v. Superior Court of Los Angeles County*
 143 Cal.App.3d 916 (1983)........................................................................................ 22

*T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Assoc.*
 809 F.2d 626 (9th Cir. 1987)..................................................................................... 10

*Wilson v. Northwest Marine Iron Works*
 212 F.2d 510 (9th Cir. 1954)..................................................................................... 24

*Wine & Canvas Dev. LLC v. Weisser*
 No. 1:11-CV-01598, 2014 WL 4053928 (S.D. Ind. Aug. 15, 2014) ........................ 11

*Wine & Canvas Dev., LLC v. Muylle*
 868 F.3d 534 (7th Cir. 2017)..................................................................................... 11

**Statutes**

15 U.S.C. § 1115(b) ........................................................................................................... 5

Cal. Comm. Code § 2309.................................................................................................. 12

*Estate of Elvis Presley v. Russen*
 513 F. Supp. 1339 (D.N.J. 1981) ............................................................................... 20

Pa. Ann. Stat. tit. 42 § 8316 ........................................................................................... 20

Va. Code Ann. § 8.01-40 (2011)..................................................................................... 20

**Other Authorities**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2010) ..... 10, 14

**Rules**

Cal. Civ. P. Code § 338(1) .............................................................................................. 22

Cal. Code Civ. Proc. § 399(1) ........................................................................................ 21

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

Fed. R. Civ. P. 56(a) ............................................................................................................. 9

Fed. R. Civ. P. 56(e) ............................................................................................................. 9

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

MOTION FOR SUMMARY JUDGMENT
CASE NO. 4:17-CV-05015 HSG

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

## I.    INTRODUCTION

Over the past 12 years, Defendant North Coast Brewing Company, Inc. ("North Coast") built a successful brand of ale named BROTHER THELONIOUS ("BT"). This was done via a 2006 agreement with Plaintiff The Estate of Thelonious Sphere Monk ("Monk"). That agreement has operated to the *mutual benefit* of each of Monk, North Coast, and the Thelonious Monk Institute of Jazz ("Monk Institute") throughout that time. In discovery, Monk admitted that North Coast's now-accused actions have only ever "*enhanced*" Mr. Monk Sr.'s legacy, and helped Monk secure new licensing arrangements and increase royalty rates from existing music licensees. Monk has also now admitted that no acts of North Coast caused financial harm to Monk, and adduced no evidence that acts of North Coast prevented Monk from securing additional revenue streams from the name, image or likeness of Mr. Monk Sr. In turn, the Monk Institute (of which Mr. Monk Jr. was Chairman since 1987) has received well over $1,000,000 in donations from North Coast over the past decade based on sales of North Coast's BT brand.

Of course, Monk's frequent and unqualified support for the BT brand over the years was not limited to North Coast's BT Ale *per se*, but also expressly included "all the wonderful things" that North Coast (like any brewery) sold and distributed for the purpose of marketing its BT Ale. Mr. Monk Jr.'s Facebook post in 2013 is but one example of Monk's knowledge and encouragement of both the BT Ale and Beer Gear[1]:

> Anyone who follows me on social media knows that I live in my Brother Thelonious gear, especially at this time of year.... Thanks to Doug and Deborah Moody's commitment to keep jazz alive and support the development of its future, a portion of the proceeds of the sale of all Brother Thelonious products – the award-winning Belgian ale ***and all the wonderful things in the online store***– go to the Thelonious Monk Institute of Jazz.

This mutually-beneficial relationship seemed to go rather well over the course of a

---

[1] The parties have used the term "Beer Gear" to capture the items identified at para. 38 of the FAC (e.g., shirts, hats, beer tap handles, posters, signs, keychains, etc.) that North Coast sold and distributed for the purpose of marketing and distributing the BT Ale.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

decade, during which time North Coast substantially expanded its physical facilities as sales of BT increased, along with the corresponding donations to the Monk Institute. However, in April 2015, the Monk Institute's Board voted out Mr. Monk Jr. as Chairman, voting Mr. Herbie Hancock in as its new Chairman. To put it lightly, Mr. Monk Jr. was not happy about this change. Monk has acknowledged that his removal as the Monk Institute's Chairman "absolutely" had "nothing to do with North Coast." Nevertheless, in December 2015 (and by confirming letter in January 2016), Monk "directed" North Coast to start sending the Monk Institute's agreed share of the proceeds from the BT Ale and Beer Gear directly to Mr. Monk Jr., rather than to the Monk Institute. North Coast declined this unilateral and material change to an agreement that had been in place between the parties for more than a decade—in part because the parties' agreement expressly provided that North Coast's donations would be made to the non-profit Monk Institute in support of jazz education, not to Mr. Monk Jr. individually. Notably, the letter seeking this change was careful to <u>not</u> terminate the decade-long agreement that had been in place between Monk and North Coast. To date, Monk has never expressly terminated the 2006 agreement.

More than 18 months after Monk's unsuccessful efforts to make a unilateral change to the 2006 agreement (including more than a year of complete silence from Monk), Monk filed the Complaint in this action in August 2017. In the Complaint, as in the First Amended Complaint ("FAC") filed weeks later, Monk falsely alleged that "at no time" had North Coast been authorized to use the BT brand on Beer Gear. Although the Court was required to accept that allegation as true for purposes of denying North Coast's Motion to Dismiss, discovery (including but not limited to the social media post quoted above) has proven the utter falsity of that claim.

During an ample 8-month discovery period, Monk served no interrogatories, no requests for admission, and deposed only one person. Monk even declined repeated reminders to inspect the many "things" (e.g., various items of Beer Gear and non-"document" signage/advertisements) that North Coast had assembled—at significant time and expense—in response to a document request Monk served in late December 2017. Monk likewise did not depose either of North Coast's two experts – one on damages and one on commercial IP licensing during the expert

discovery phase of the case.[2] Monk has utterly failed to develop facts necessary for its own case, or to controvert the extensive and case-dispositive record developed by North Coast in discovery.

## II.   FACTS

North Coast is a single-location craft brewery located in Fort Bragg, California. FAC ¶¶ 25-26. Since its founding in 1988, North Coast has been a substantial patron of the arts, particularly jazz music.  Declaration of Robert W. Zelnick ("Zelnick Decl.") at ¶ 3, Ex. 2, Douglas Moody Depo. Tr., March 28, 2018, at 49:6-10; Zelnick Decl. at ¶ 4, Ex. 3, North Coast 2016 Annual Sustainability Report (PX 26), at NCBC002712. North Coast is a certified B Corporation, meaning North Coast has demonstrated a strong commitment to sustainability and philanthropy as part of its business. Ex. 2 at 131:21-132:15; *see also* Ex. 3. Indeed, Monk's witness confirmed that "In the [North Coast] business model, altruism is a major factor." Zelnick Decl. at ¶ 5, Ex. 4, Denise Pruitt Depo. Tr., June 5, 2018, at 310:16-19.

In 2005, North Coast developed an interest in adding a Belgian-Style Abbey Ale to its existing lineup of craft beers. Ex. 2 at 42:9-19. North Coast brainstormed potential ideas for the name of the new brand, including some pun in relation to the word "monk" (i.e., because it would be an "abbey" ale). *Id*. Recognizing the potential synergy of this idea with North Coast's commitment to jazz education, in late 2005 North Coast approached the President of the Monk Institute, Tom Carter, with the idea of offering a significant ongoing donation to help the Monk Institute's jazz education program, based on sales of a new beer that would be named "BROTHER THELONIOUS." *Id.* at 32:14-21; 34:15-36:1; 42:5-24. After several conversations, Mr. Carter advised that he and his Board[3] would be interested in exploring this idea further. *Id.* at 35:10-25.

North Coast did not want to step on anyone's toes, and would not have proceeded with the

---

[2] Discovery has revealed that Monk's counsel has been retained on a full contingent fee basis. Zelnick Decl. at ¶ 2, Ex. 1, Thelonious Sphere Monk, Jr., Depo. Tr., March 27, 2018, at 279:12-280:2. Monk's counsel's strategy has been one of trying to "break" North Coast through intransigence and lack of cooperation through the close of discovery, while minimizing expense to themselves.

[3] Mr. Monk Jr. was Chairman of the Board of Trustees of the Monk Institute from 1987 until 2015. Ex. 1 at 17:24-18:8

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

BT concept if Monk disapproved. *Id.* at 92:12-93:2; 112:19-22. Therefore, in early 2006, Mr. Carter arranged an introduction between North Coast and Mr. and Mrs. Monk Jr., who were both *delighted* with North Coast's BT brand. *Id.* at 108:3-10; *see also* Zelnick Decl. at ¶ 6, Ex. 5, Certified Transcript of T.S. Monk Interview, March 6, 2015 (DX 106). At that meeting, Monk agreed (according to Monk's FAC) as follows:

> 37. Prior to the present dispute, T.S. Monk verbally agreed to permit North Coast to utilize the THELONIOUS MONK name, image and likeness for the limited purpose of solely marketing and distributing BROTHER THELONIOUS BELGIAN STYLE ABBEY ALE in exchange for North Coast's agreement to donate a portion of the profits … to the Monk Institute.

FAC ¶ 37; *see also* Ex. 1 at 53:20-54:15; 304:21-305:4; 312:15-22; Ex. 2 at 27:2-19; 107:24-109:18.

Monk never expressed any reservation or right to terminate, revoke, modify or otherwise withdraw consent to North Coast's use of the Monk Image. Ex. 1 at 170:14-19; 306:3-307:20. The donation to the Monk Institute was "the only requirement" for Monk's 2006 consent. *See* ECF No. 33 at p. 7; Ex. 2 at 31:9-32:4. Thus, for more than a decade beginning in 2006, North Coast dutifully donated $2/standard case or case equivalent ($2.50 for cases of the 750ml bottles) of BT Ale to the Monk Institute, as well as 25% of the top line revenue (i.e., before sales tax) for the BT Beer Gear. Ex. 2 at 82:10-85:25; 219:7-11; 270:1-7; *see also* Zelnick Decl. at ¶ 7, Ex. 6, Monk Institute 30(b)(6) Depo. Tr., at 96:20-97:1. Since 2006, North Coast has donated well over $1,000,000 to the Monk Institute per the 2006 agreement. *See* Zelnick Decl. at ¶ 8, Ex. 7, T.S. Monk Marketing Slide Deck (DX 49), at MONK07759.

Along with the BT Ale, North Coast also sold and distributed BT Beer Gear for the sole purpose of marketing and distributing the BT Ale. Zelnick Decl. at ¶ 9, Ex. 8, Douglas Moody Depo. Tr., June 20, 2018, at 22:24-23:16. Mr. Monk Jr. was aware of and wore the BT Beer Gear "a lot" over the years, as has been documented in photographs since at least April 2009.[4] Indeed,

---

[4] *See*, *e.g.*, Ex. 1 at. 69:8-24; 73; 74:12-17; 77:5-18 (Zelnick Decl. at ¶ 10, Ex. 9, Nov. 24, 2013 Photograph with Comments from T.S. Monk to Deborah Moody (DX 13)); *id.* at 79:16-22 (Zelnick Decl. at ¶ 11, Ex. 10, Mar. 20, 2013 Photograph with Comments from T.S. Monk re BT pullover (DX 14)); *id.* at 96:2-22 (Zelnick Decl. at ¶ 12, Ex. 11, Photo of T.S. Monk in BT Shirt 2009 (DX 20)); *id.* at 110:22-111:20 (Zelnick Decl. at ¶ 13, Ex. 12, Email dated Nov. 4, 2013 from Doug Moody to T.S. Monk re BT Jacket (DX 26)); *id.* at 127:6-128:8; 258:6-9; 293:25-

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

Monk recognized that marketing the BT Ale *required* many Beer Gear items, including at least pins, t-shirts, sweatshirts, hoodies, hats and other goods that are typically used by brewers to market their beer. Ex. 1 at 122:9-11; 128:4-8; Zelnick Decl. at ¶ 14, Ex 13, Plaintiff's Amended Responses and Objections to Defendant's Amended Second Set of Requests for Admission at pp. 16-17 (RFA Nos. 142-143). Despite allegations in the FAC that this Beer Gear was causing damage and irreparable harm to Monk (FAC ¶¶ 54-55), Mr. Monk Jr. continued to wear many items of BT Beer Gear *well after the complaint was filed in this case.* Ex. 1 at 271:13-272:16; Ex. 4 at 34:13-35:3; Zelnick Decl. at ¶ 15, Ex. 14, Plaintiff's Third Amended Responses and Objections to Defendant's Amended First Set of Requests for Admissions at p. 33 (RFA Nos. 74-75).

Also in 2006, North Coast communicated to the Monk Institute North Coast's plans to register the BT trademark. Ex. 2 at 139:21-140:10. North Coast secured two federal trademark registrations—for the BROTHER THELONIOUS logo/label and for the BROTHER THELONIOUS word mark—in 2007 and 2014, respectively. *See* Zelnick Decl. at ¶¶ 16 and 17, Ex. 15, Federal Trademark Reg. No. 3,285,256 and Ex. 16, Federal Trademark Reg. No.4,555,981.[5]

Among much other incontrovertible evidence, in March 2013 Monk posted a photo of himself wearing the BT Beer Gear and provided a link to North Coast's page: "Anyone who follows me on social media knows that I live in my Brother Thelonious gear." Ex. 9; *see also* Ex. 1 at 87:9-15. By that time in 2013, Monk had been wearing the Beer Gear for "multiple years." Ex. 4 at 35:12-25. Again in 2013, Monk encouraged the public to purchase the full range of Beer Gear available in North Coast's online store, and also confirmed that he knew that proceeds of sales of all of the Beer Gear benefitted the Monk Institute:

---

294:6; *see also* Ex. 4 at 33:14-34:12.

[5] North Coast's U.S. Reg. No. 3,285,256 was declared "incontestable" by the USPTO on September 13, 2013, meaning that it serves as "conclusive evidence of the validity of the registered mark and of the registration of the mark, and of the registrant's [North Coast's] exclusive right to use the registered mark in commerce…." 15 U.S.C. § 1115(b). The certified status and title copies of these registrations, which are attached as Exs. 15 and 16, are self-authenticating, per 15 U.S.C. §1057(f).

> Thanks to Doug and Deborah Moody's[6] commitment to keep jazz alive and support the development of its future, a portion of the proceeds of the sale of all Brother Thelonious products – the award-winning Belgian ale **and all the wonderful things in the online store** – go to the Thelonious Monk Institute of Jazz.

Ex. 10 (DX 14). The foregoing social media post likewise contained a link to North Coast's online store where the full line of BT Beer Gear was being sold. *Id.* Though he wore, knew about, and encouraged North Coast's distribution and sale of the Beer Gear much earlier, at least the following items of BT Beer Gear were among "all the wonderful things" being sold by North Coast when Monk lauded the BT Beer Gear and directed the public to North Coast's store in 2013: glassware, tap handles, neon signs, mouse pads, playing cards, an array of shirts, aprons, hats, pins, stickers, coasters, tin signs, beer brittle, jackets, luggage tags, keychains and bottle openers. Ex. 1 at 252:17-254:16; Zelnick Decl. at ¶ 18, Ex. 17, BT Merchandise Sales Report (PX 24); Ex. 4 at 40:3-11; 41:2-22; 71:22-73:2; Zelnick Decl. at ¶ 19, Ex. 18, Email dated Nov. 6, 2013 from D. Pruitt to Deborah Moody Re Copy of Facebook Message (DX 30).

Since the social media posts by Monk in 2013, North Coast has introduced no new items to its line of BT Beer Gear. Ex. 1 at 166:12-21; Ex. 6 at 31:9-15. To the contrary, since this dispute has arisen, but before the Complaint was filed, Monk's witness testified that North Coast substantially *reduced* the range of Beer Gear (*see* Ex. 4 at 285:22-286:10), and in 2018 ultimately completed a sell-off of BT ale and Beer Gear, and suspended sale and distribution of all BT Ale and Beer Gear pending the outcome of this litigation (*see* Ex. 8 at 21:5-24, 28:1-13).

In June 2014, North Coast and Monk made arrangements for Mr. Monk Jr. to perform at the re-opening of North Coast's "Sequoia Room," which is a small music venue at North Coast's brewery in Fort Bragg. Pursuant to these arrangements, Mr. Monk Jr. made his first-ever visit to North Coast in March 2015 to perform with his sextet and their crew. While visiting North Coast, Monk, Jr. again saw the array of BT Beer Gear that was for sale in North Coast's physical store in Fort Bragg and displayed in North Coast's Sequoia Room. Ex. 1 at 86:23-87:3. Monk did not express any complaints or objections to North Coast about any of the Beer Gear. Ex. 4 at 180:25-

---

[6] Since 2003, Doug Moody has been the Senior Vice President of North Coast, and Deborah Moody is his wife. Ex. 2 at 59:23-60:5.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

181:11; Ex. 1 at 124:1-125:14.

In November 2014, Monk proposed a meeting with North Coast. Ex. 4 at 77:13-20. North Coast's SVP Douglas Moody met with Steven Reich (Monk's counsel and licensing advisor), Mrs. Gale Monk and Denise Pruitt (Monk's marketing employee), at which time Monk introduced its proposal for a potential expanded partnership between Monk and North Coast. Ex. 2 at 171:16-173:18; Ex. 4 at 83:13-85:4. During those November 2014 discussions, Monk did not intend to, and did not, end the 2006 contract with North Coast or have North Coast stop selling BT Ale or any Beer Gear. Zelnick Decl. at ¶ 20, Ex. 19, Gale Monk Depo Tr., March 27, 2018, at 51:17-56:1; Ex. 1 at 192:11-25. Rather, Monk was seeking to "formalize" the 2006 oral "handshake agreement"—under which all parties had theretofore operated for 8 years—into a written agreement. Ex. 1 at 191:10-192:2. Monk was particularly interested in having North Coast participate in expanded publicity surrounding the upcoming 2017 Centennial of Mr. Monk Sr.'s birth. Ex. 1 at 241:21-243:17; Zelnick Decl. at ¶ 21, Ex. 20, Audio Transcript from Monk Institute Board Meeting, April 8, 2015 (DX43), at MONK00292. Prior to the Centennial, Monk did not have a public profile outside of its relationship with record companies. Ex. 4 at 196:24-198:6. Monk sought to expand and participate in what it considered North Coast's "successful merchandising business" for the BT brand. *Id.* at 88:15-89:13; Zelnick Decl. at ¶ 22, Ex. 21, Email dated Feb. 26, 2015 from S. Reich to D. Moody Re: Brother Thelonious (DX 39).

On February 26, 2015, Mr. Reich sent a written follow-up to the November 2014 meeting. *Id.* In that letter, Mr. Reich stated as follows on behalf of Monk[7]:

> Since 2006 **North Coast has established its brand 'BROTHER THELONIOUS'** for its 'Belgian Style Abbey Ale.' **Accompanied by high quality merchandise** this beer has become very successful, allowing NCB to donate annually increasing sums to the THELONIOUS MONK INSTITUTE OF JAZZ, based on NCB's generous 'two dollars of donation for the Monk Institute per case of beer/ale' policy.
>
> ***
>
> After this very successful first phase it is the MONK ESTATE's interest to both

---

[7] Monk admits this letter was sent to North Coast on behalf of Monk at Monk's direction, and that Monk contemporaneously received a copy of it. Ex. 13 at p. 13 (RFA No. 126); Ex. 1 at 199:1-14, 213:16-18.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> enhance and participate in ***this successful merchandising business*** with the aim of creating ***further*** products and productions suitable for merchandising, education and entertainment, such as records, shows, products of various kinds, endorsements and programs, with the intention to make [North Coast's] brand BROTHER THELONIOUS even stronger and thus to further increase funding to the Monk Institute's benefit, and, in addition, generating additional income for ***the MONK ESTATE, which has refrained from demanding any license for the first ten years of marketing BROTHER THELONIOUS.***

*Id.* (emphasis added). Among the new activities that Monk proposed were "the engagement of [Mr. Monk Jr.] as 'Jazz Ambassador of [North Coast]' at jazz festivals, concerts, a [North Coast]-Monk TV Channel and similar events…." *Id.*; *see also* Ex. 4 at 83:13-85:4. By no means did the February 2015 Reich letter terminate consent that Monk granted to North Coast in the 2006 agreement. *See* Ex. 21 (DX 39).

North Coast advised that Monk needed to supply a detailed business plan and budget for the proposal. Ex. 2 at 180:4-19. Monk never provided either. Ex. 1 at 194:20-25, 195:16-21, 196:12-15. The parties ultimately reached no agreement for expanded activities. Ex. 1 at 242:12-243:17; Ex. 2 at 178:13-183:7. Monk does not fault North Coast for not entering the proposed expanded agreement. Ex. 1 at 243:18-20.

Monk first instructed a lawyer to advise North Coast that it had a concern with North Coast's use of the BT brand in December 2015. Ex. 1 at 124:1-6, and Monk's counsel sent a letter on January 11, 2016. FAC, Ex. 2; Ex. 1 at 124:7-125:14. That January 11, 2016 letter—which Monk now incorrectly tries to characterize as a "termination letter" (FAC ¶ 39)—sought to make a unilateral change in the parties' agreement, namely, that North Coast should start sending the agreed donations under the 2006 agreement to Mr. Monk Jr. rather than to the non-profit Monk Institute (*See* FAC Ex. 2). North Coast declined this unilateral change to the agreement, and continued to make agreed donations to the Monk Institute, per the parties' 2006 agreement. Ex. 6 at 96:20-97:1. By its terms, the so-called "termination letter" did not terminate the consent that had been granted by Monk, but instead sought to add additional conditions to it. FAC at Ex. 2.

On August 29, 2017, after more than one year of silence from Monk, Monk filed the Complaint in this action (ECF No. 1). While acknowledging that the parties had an agreement for Ale *per se*, the Complaint and FAC both suddenly alleged the opposite for the Beer Gear:

1

2

3

38.     "At no time prior has T.S. Monk or the Monk Estate authorized North Coast to utilize the THELONIOUS MONK name, image or likeness for the sale of merchandise such as cups, hats, hoodies, iron on patches, soap, t-shirts, tap handles, metal and neon signs, pins, playing cards, mouse pads, posters and food products."

4

FAC ¶ 38.

5

6

7

8

9

In June 2018, North Coast finished a sell-off of BT and suspended sales of BT Ale and Beer Gear pending the outcome of this litigation. Ex. 8 at 28:1-13; Ex. 6 at 96:20-97:1. Thus, sadly, the Monk Institute is no longer receiving donations based on sales under the BT brand. North Coast has made all agreed donations to the Monk Institute, and owes the Monk Institute no further funds. Ex. 6 at 96:20-97:1.

10

### III.   ARGUMENT

11

#### A.   SUMMARY JUDGMENT STANDARD

12

13

14

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has stated:

15

16

17

18

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

19

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

20

21

22

23

24

25

26

27

28

A plaintiff opposing summary judgment must set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Kaiser Cement Corp. v. Fischbach and Moore, Inc.*, 793 F.2d 1100, 1103-04 (9th Cir. 1986). "Clearly, the non-moving party must do more than simply show there is some metaphysical doubt as to the material fact." *T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987) (citations omitted). The nonmoving party cannot rely on the allegations in his or her pleadings, but is required to present "concrete evidence" from which a judge or reasonable jury could return a favorable decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Thus, "[i]f evidence is merely colorable . . . or is not significantly probative, summary judgment may be

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1    granted." *Id.* "…[W]here the uncontradicted facts established through discovery are susceptible of

2    only one legitimate inference, summary judgment is proper." *High Country Linens, Inc. v. Block*,

3    No. C 01-02180 CRB, 2002 WL 1998272, at *2 (N.D. Cal. Aug. 20, 2002).

4        **B.    NORTH COAST'S ACCUSED ACTIONS CANNOT BE DEEMED INFRINGING
          BECAUSE THEY WERE PERMITTED BY A VALID CONTRACT BETWEEN THE
5         PARTIES**

6        A party that has the owner's consent for use cannot be charged with infringement of the

7    owner's rights. *See, e.g., Oracle Am., Inc. v. Hewlett Packard Enter. Co.*, No. 16-CV-01393-JST,

8    2017 WL 635291, at *5 (N.D. Cal. Feb. 16, 2017) (citing *Rano v. Sipa Press, Inc.*, 987 F.2d 580,

9    585 (9th Cir. 1993) (consent is a defense to claim of IP infringement)); *see also Wine & Canvas*

10   *Dev. LLC v. Weisser,* No. 1:11-CV-01598-TWP, 2014 WL 4053928, at *8 (S.D. Ind. Aug. 15,

11   2014), *aff'd but criticized sub nom. Wine & Canvas Dev., LLC v. Muylle*, 868 F.3d 534 (7th Cir.

12   2017).

13       **1.    Monk Consented to North Coast's Use of the Monk Name, Image and
              Likeness in Connection With Marketing and Distributing BT Ale**

14       Monk acknowledges that in 2006, the parties entered a contract whereby Monk consented

15   to North Coast's use of the accused name, image and likeness of Mr. Monk Sr. "for the purpose

16   of solely marketing and distributing [BT] ale." FAC ¶ 37. The consideration was that consent was

17   granted "in exchange for" North Coast's future donations to the Monk Institute.[8] The agreement

18   as plead by Monk contained no additional terms or obligations on North Coast. *Id.*; *see also* ECF

19   No. 33 at 3 (Indeed, "***The only requirement***" was North Coast's payment to the Monk Institute)

20   [emphasis added]. Monk admitted that it did not express any reservation of any right to modify or

21   terminate the 2006 agreement. Ex. 1 at 170:14-19, 306:3-307:20. It was Monk's burden to

22   express intent to retain control over its alleged IP rights: "A belated statement [from the alleged

23   rights holder] was not sufficient." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir.

24

25   ────────────────

26   [8] Moreover, as explained at Section III.G, *infra*, these facts would likewise constitute promissory
     estoppel: "[T]he person who benefits from the consent to use the trademark may so rely on the
27   consent as to create an estoppel which ***prevents later withdrawal or termination of the consent***."
     J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 32:106 at 32-375 (4th
28   ed. 2010) (emphasis added); *see also Croton Watch Co., Inc. v. Laughlin*, 208 F.2d 93, 96 (2d
     Cir. 1953) (consent to use cannot be "withdrawn" years later).

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

2008); *Intelligraphics, Inc. v. Marvell Semiconductor, Inc.*, No. C07-02499 JCS, 2009 WL 330259, at *11 (N.D. Cal. Feb. 10, 2009) (deeming consent to be without any caveats or limitations when contract contained no language suggesting an intent to retain control over IP rights).

Monk admits that his consent was not merely for the BT Ale *per se*, but "for the purpose of solely marketing and distributing BROTHER THELONIOUS BELGIAN STYLE ABBEY ALE." FAC ¶ 37. North Coast has testified that "The whole purpose of the merchandise [i.e., BT Beer Gear] was to market and distribute the beer." Ex. 2 at 23:11-13.[9] Monk has elicited no documents or testimony from anyone at North Coast that North Coast had *any* different or additional purpose for the Beer Gear. *See* Ex. 1 at 135:20-25; Ex. 4 at 46:11-15.[10]

### 2.     Monk Never Terminated the 2006 Contract

Regardless of how Monk would now like to characterize its counsel's January 2016 letter, as a matter of law it did not terminate North Coast's consent. Indeed, the 2016 letter assiduously avoided "terminating" *Monk's consent*, and Monk testified that he did not want to terminate the agreement with North Coast. *See* FAC at Ex. 2; Ex. 1 at 191:10-192:2. In fact, the only thing the letter purported to "terminate" was the "direction to pay royalties to the Monk Institute." *Id*. Such a unilateral change is not permitted under California law.[11] Here, Monk testified that North Coast never agreed to any amendment of the 2006 agreement. Ex. 14 at p. 30 (RFA No. 64).

Moreover, Monk's request that North Coast's future donations be sent to him personally

---

[9] Indeed, North Coast was not entering the apparel or souvenir business, and the "Beer Gear" it distributed and sold were items that are very commonly used to promote beer – e.g., "swag" such as shirts, hats, keyrings, bottle openers, signs, posters, cups/glassware, pins, etc.

[10] Monk's long-time marketing employee testified that she never contemplated that the Beer Gear was sold for a purpose *other than* to market and distribute the ale. Ex. 4 at 11-15. The Monk Institute likewise understood that this was the purpose of the Beer Gear. Ex. 6 at 23:17-22.

[11] *See e.g., Savetsky v. Pre-Paid Legal Servs., Inc.*, No. 14-03514 SC, 2015 WL 4593744, at *5 (N.D. Cal. July 30, 2015) (recognizing that California law does not permit unilateral contract modifications); *Sapiro v. Musicians' Union of San Francisco, Local No. 6*, No. C-87-850 AJZ, 1987 WL 58071, at *3 (N.D. Cal. Dec. 21, 1987) ("If a contract between two private parties allowed for unilateral change by one, it would be unconscionable."); *Kaltwasser v. Cingular Wireless LLC,* No. C 07-00411, 2008 WL 3925445, at *2 (N.D. Cal. Aug. 22, 2008) ("[T]he Ninth Circuit recently has held that "a party can't unilaterally change the terms of a contract; it must obtain the other party's consent before doing so. This is because a revised contract is merely an offer and does not bind the parties until it is accepted.") (citing *Douglas v. U.S. Dist. Ct. for the Cent. Dist. of California,* 495 F.3d 1062, 1066 (9th Cir.2007)).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1  rather than to the non-profit Monk Institute was a material change that would have (among other

2  things) deprived North Coast of a tax deduction in connection with its donation. Ex. 4 at 82:17-

3  83:3; *Cf. Serafin v. Balco Properties Ltd., LLC,* 235 Cal. App. 4th 165, 176 (2015) ("California

4  law prevents a party from exercising a discretionary power, such as the power to modify, in bad

5  faith or in a way that deprives the other party of the benefits of the agreement").

6              **3.**       **Even if, *Arguendo,* the Complaint Could Constitute Constructive**

7                      **Notice of Termination of the 2006 Oral Agreement, North Coast Ceased the Accused Activities Within a Reasonable Time Thereafter**

8        California law requires reasonable notice to effect termination of an oral contract. Cal.

9  Comm. Code § 2309 (2016) states, "Termination of a contract by one party except on the

10  happening of an agreed event requires that reasonable notification be received by the other party

11  and an agreement dispensing with notification is invalid if its operation would be

12  unconscionable." *See Great W. Distillery Prod. v. John A. Wathen Distillery Co.,* 74 P.2d 745,

13  747 (1937) (when contract is silent as to its duration, the party seeking to terminate must give the

14  other party reasonable notice thereof, and such termination cannot be effected until at least a

15  reasonable time has expired.). What constitutes "reasonable notice" varies under the facts of each

16  case. In this case, the relevant facts are not in dispute.

17        Monk proposed a *two-year* sell-off period following termination of the "formalized"[12]

18  relationship it was proposing in November 2014 and February 2015. *See* Ex. 21 at NCBC000003.

19  That is the best indication of what would be "reasonable" here.  Indeed, as Monk well knew,

20  North Coast had over the course of more than a decade built and invested millions of dollars in a

21  substantial and growing business around the BT brand, which allowed it to contribute well over

22  $1,000,000 to the Monk Institute. *See id.* at NCBC000001-2; Ex. 6 at 71:12-71:10; Ex. 5; Ex. 4 at

23  283:20-284:17; 284:24-285:8.

24        North Coast made the difficult decision to sell off its BT goods and suspend its successful,

25  growing 12-year BT brand within 10 months after the Complaint was filed. That is well within

26

27  [12] Monk testified that Monk's proposal through the Reich letter was for the purpose of
   "formalizing" the existing relationship between the parties. Ex. 1 at 212:10-12 ("The point was

28  that after a decade…it's time for a [written] agreement.")

1   any "reasonable notice" period under the facts of this case. *Cf. J.C. Millett Co. v. Park & Tilford*

2   *Distillers Corp.*, 123 F. Supp. 484, 492 (N.D. Cal. 1954) (termination effective 15 months after

3   termination to allow terminated party "through fairness, to have a reasonable time and notice of

4   the cancellation of the contract in order that he might have a reasonable opportunity to put his

5   house in order").

6       **C.**    **THE MONK ESTATE'S TRADEMARK INFRINGEMENT CLAIM FAILS AS A MATTER OF LAW**

7       To prevail on a claim of trademark infringement under the Lanham Act, a party must

8   prove: "(1) that it has a protectable ownership interest in the mark; and (2) that the defendant's

9   use of the mark is likely to cause consumer confusion." *Dep't of Parks & Rec. v. Bazaar Del*

10  *Mundo, Inc.,* 448 F.3d 1118, 1124 (9th Cir. 2006). "[A] plaintiff trademark owner must establish

11  a valid, protectable interest in order to proceed to the second prong of the trademark infringement

12  analysis—the likelihood of confusion resulting from the defendant's alleged infringing use."

13  *A*pplied *Info. Scis. Corp. v. eBAY, Inc*., 511 F.3d 966, 972 (9th Cir. 2007).

14      **1.**    **Monk Cannot Claim a Protectable Trademark Ownership Interest Because Monk Failed To Establish or Exercise "Quality Control" Over North Coast for More Than a Decade**

15

16      The Ninth Circuit has repeatedly confirmed that a trademark owner who granted consent

17  to use of a trademark abandons its trademark rights when the consentor "did not retain ***express***

18  ***contractual control*** over [consentee's] quality control measures" and "did not have ***actual***

19  ***controls*** over [consentee's] quality." *Freecyclesunnyvale v. Freecycle Network*, 626 F.3d 509 at

20  516-520 (9th Cir. 2010) [emphasis added]. The Ninth Circuit calls this "naked licensing," which

21  necessarily results in abandonment of the trademark rights to which the owner granted consent:

22

23      [T]rademark owners have a duty to control the quality of their trademarks. *McCarthy* § 18:48. It is well-established that '[a] trademark owner may grant a license ***and remain protected*** provided quality control of the goods and services sold under the trademark by the licensee is maintained'…. 'Naked licensing' occurs when the licensor 'fails to exercise adequate quality control over the licensee…. ***We have previously declared that naked licensing is 'inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor.'***

24

25

26

27  *Id.* at 515 (*citing Barcamerica Int'l USA Trust v. Tyfield Importers, Inc*., 289 F.3d 589, 595–96

28  (9th Cir. 2002)). *See also,* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

*Competition* § 18:79 at 18-207 (4th ed. 2010) ("[If] party A 'consents' to Z's usage which is an infringement, then it would be a 'license' **which requires quality control to be valid** and **to prevent abandonment or loss of priority.**") [emphasis added].[13] This is because "A trademark carries with it a message that the trademark owner is controlling the nature and quality of the goods or services sold under the mark." McCarthy, § 18.48.

Here, Monk repeatedly admitted in discovery that he did not exercise any control—much less legally-cognizable quality control—over North Coast or its BT Ale and Beer Gear[14]:

- Monk admitted he did not even try to exercise Quality Control over what North Coast had done with North Coast's BT brand and in connection with the name, image, and likeness of Thelonious Monk from 2006 until at least 2015 (Ex. 1 at 206:16-207:14, 297:9-298:9, 300:10-18, 301:10-13; Ex. 4 at 181:16-182:6)

- Monk admitted there were no reports or other evidence of quality control (Ex. 1 at 300:10-18);

- Monk admitted that he did not give North Coast "any" instructions regarding quality standards to be followed (*Id.* at 297:9-298:21);

- Monk admitted that he "couldn't" exercise quality control over the BT ale (*Id.* at 206:16-207:4);

- Monk admitted that he never visited North Coast's operations until 2015 (*Id.* at 86:23-87:3);

- Monk admitted that he "had no reason" to conduct quality control from 2006-2015 (*Id.* at 204:9-18; 206:4-207:4);

- Monk admitted that he did not even review the BT label image over time to see if it had changed (*Id.* at 301:10-13).

Even if Monk's counsel's interrogatory answer regarding quality control were to be accepted as true[15], the facts alleged therein are woefully inadequate—as a matter of law—to constitute legally necessary "quality control," for, *inter alia*, several reasons. First, Monk alleged in his interrogatory answer[16] that he relied on his sense that North Coast was a "highly-regarded

---

[13] A corollary is that the grant of mere "consent" to use another's trademark, without quality control, is not terminable years later. *Brennan's Inc. v. Dickie Brennan & Co., Inc.*, 376 F.3d 356, 367 n. 5 (5th Cir. 2004).

[14] North Coast likewise confirms Monk did no quality control whatsoever. Ex. 2 at 298:12-15.

[15] North Coast does not suggest that Monk's lawyer-written interrogatory answers should be accepted as true, particularly insofar as they are directly contravened by the abundant admissions in Monk testimony and other evidence that Monk exercised no quality control.

[16] North Coast's Interrogatory No. 1 asked "Describe in detail any and all Quality Control that you claim was conducted by or on behalf of Plaintiff in relation to North Coast's use of the

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

craft brewery," that had "been in existence since 1988," and was "approximately the 35th largest brewery in the country." Those facts do not come *close* to establishing quality control. *See, e.g., Barcamerica*, 289 F.3d at 597 (reliance on the reputation of even a "world-class" winemaker inadequate to constitute quality control). Monk likewise cannot rely on 2018 testimony that North Coast "has always endeavored to choose merchandise that [was] of good quality" or that "They were doing everything on a classy level…. [E]verything they were doing was quality . . . By letting everyone know 'Don't mess around with my father,' everything that had to do with Thelonious had to be first class." *See* Ex. 2 at 240:20-23; Ex. 1 at 206:16-207:4; 297:9-297:23; *Barcamerica*, 289 F.3d at 597 (testimony that licensee "strives extremely hard to have the highest possible standards" inadequate for quality control). Instead, quality control is about continuously controlling and checking a level of quality that is established by the trademark owner:

> Whether Renaissance's wine was objectively 'good' or 'bad' is simply irrelevant. What matters is that Barcamerica played no meaningful role in holding the wine to a quality standard – good, bad or otherwise.

*Id.* at 289 F.3d at 597-598 (emphasis added). Indeed, legally-cognizable 'quality control' requires that the licensor (1) have a contractual right to set, review and enforce quality standards; (2) have a right to inspect North Coast's operations; and (3) actually set, review and enforce quality standards – none of which Monk did. *See FreecycleSunnyvale,* 626 F.3d 509 (affirming summary judgment of naked licensing, and therefore trademark abandonment, by a non-profit entity); *First Interstate Bancorp v. Stenquist,* No. C-89-41061990, 1990 WL 300321, at *3 (N.D. Cal. 1990) ("[I]t is well established that where a trademark owner engages in naked licensing, without any control over the quality of goods produced by the licensee, such a practice is inherently deceptive and constitutes abandonment of any rights to the trademark by the licensor."). Even when a licensor engages in some sporadic quality control, that is not enough. *See Freecyclesunnyvale,* 626 F.3d at 514-516; *Barcamerica*, 289 F.3d at 596-597 (testimony of "random tastings" of wine by the trademark owner not sufficient, without detail on "how often and under what

Brother Thelonious Brand." In turn, "Quality Control" was defined consistent with the Ninth Circuit's decision in *Freecyclesunnyvale*, 626 F.3d 509; Zelnick Decl. at ¶ 24, Ex. 22, Plaintiff's Amended Answers and Objections to Defendant's First Interrogatories at pp. 2-3.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

circumstances" he continuously sampled the product).

Second, Monk's counsel's interrogatory answer on "quality control" is utterly inadequate, insofar as it offers bald speculation and mere hearsay about what Monk allegedly believed North Coast "would have" understood regarding the quality for North Coast's goods:

> Mr. Monk Jr. testified that North Coast, through Mr. Moody, was aware of what Mr. Monk Jr. meant about a first-class product featuring Mr. Monk Jr.'s father…. Mr. Monk Jr. also stated that it was pretty clear to Doug Moody [of North Coast] that he was going to have to operate in a certain way if he wanted to use the Thelonious Monk name, image and likeness.

Ex. 1 at 297:9-298:9. Beyond the fact that these statements constitute mere speculation and hearsay, as a matter of law they do not establish quality control, as they clearly do not establish that Monk had a contractual right to exercise control and that Monk did, in fact, exercise ongoing control.  They are also utterly contradicted by Monk's deposition testimony (see supra) and pleadings.  *See* ECF No. 33 at 3 ("***The only requirement***" [for consent] was North Coast's payment to the Monk Institute") [emphasis added].

## 2.      The Statute of Limitations Bars the Trademark Infringement Claims

Because the Lanham Act contains no express statute of limitations, California courts "borrow" the limitations period from the most closely analogous action under state law. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836 (9th Cir. 2002). In *Jarrow,* the court recognized a 3-year statute of limitations for the Lanham Act claims, "borrowing" from the statute of limitations for fraud under state law. *Id*. at 838.[17]

The actions Monk now complains of have been ongoing since 2006, when both the BT Ale and BT Beer Gear were introduced. Ex. 2 at 148:12-14, 219:5-6. While North Coast's array of Beer Gear may have evolved after 2006[18], Monk has provided no evidence that any items of Beer Gear sold by North Coast in 2013 (*i.e.*, when Monk encouraged the public to buy "all the wonderful things" in North Coast's online store) were different from anything sold after 2013.

---

[17] In the case at bar, the Court alternatively could apply the even-shorter two-year statute of limitations that is applicable to the right of publicity claims as the statute of limitations for the Lanham Act claims. *See Section D.4, infra.*

[18] Even if there were any additions made to North Coast's line of Brother Thelonious Beer Gear (which Monk has not shown), Monk has testified that any such modifications would not have caused any incremental harm to Monk. Ex. 19 at 38:3-39:20.

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

Ex. 1 at 166:12-21; Ex. 4 at 310:4-8. Moreover, documents from Monk's own files separately confirm that Monk was aware of the full line of 36 items of Beer Gear *at least* as early as July 2014. *See* Zelnick Decl. at ¶ 24, Ex. 23, Letter dated July 23, 2014 to Monk re North Coast Merchandise Items; *see also* Ex. 19 at 19:23-20:4. Thus, there is no dispute that the accused array of Beer Gear in this case has been openly sold, both online and in North Coast's physical stores, since *well before either a two-year or even a three-year statute of limitations could have run in this case*. *See id.*; *see also* Ex. 6 at 28:19-30:4, 31:9-15.

### 3. Monk Failed To Develop any Evidence of Record Regarding Whether North Coast's Use of the Accused BT Brand Constitutes Infringement

In Its Order denying North Coast's Motion to Dismiss, this Court identified the Ninth Circuit's eight-factor test for determining whether there is a likelihood of confusion in "false endorsement" cases involving a celebrity. *See* ECF No. 47 at 5 (citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1008 (9th Cir. 2001)).[19] Despite having the Court's roadmap, Monk utterly failed to develop evidence of record on any of these factors. As such, because Monk has produced no competent evidence on these issues (as requested by North Coast in discovery), no reasonable fact-finder could conclude that there is a likelihood of confusion, and Monk cannot prevail on his action for trademark infringement. *Id.*, 265 F.3d at 1008; *see also Celotex*, 477 U.S. at 322 (mandating summary judgment against a plaintiff that fails to make a showing sufficient to establish the existence of an element essential to its case.)

First, Monk has adduced no evidence of the level of recognition of Mr. Monk Sr. among craft beer drinkers to whom BT is directed. *See Downing*, 265 F.3d at 1008; *see* Zelnick Decl. ¶ 25, Ex. 24, Doug Bania Depo Tr., July 16, 2018, at 184:2-7. Such recognition could be established via a survey of craft beer drinkers or testimony from an expert in the field of craft beer. *Downing*, 265 F3d at 1008; *see also Network Automation, Inc. v. Hewlett-Packard Co*., No.

---

[19] Listing the eight-factor test for determining whether there is a likelihood of confusion: (1) level of recognition that the plaintiff has among the segment of society for whom the defendant's product is intended; (2) the relatedness of the fame or success of the plaintiff to the defendant's product; (3) the similarity of the likeness used by the defendant to the actual plaintiff; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser case; (7) defendant's intent on selecting the plaintiff; and (8) likelihood of expansion of the product lines. *Downing*, 265 F.3d at 1007-08.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

CV 08-4675-JFW RZX, 2009 WL 5908719, at *7 (C.D. Cal. Sept. 14, 2009) (Finding no evidence of actual recognition of the mark where the plaintiff offered no expert reports or surveys). Monk has not produced discovery on such a survey, nor has its sole expert reviewed any potentially relevant surveys or done any consumer based studies related to what is driving consumer purchases of BT Ale. *See* Ex. 24 at 85:23-86:17; 122:6-8.

Second, Monk has adduced no evidence regarding any relationship between Mr. Monk Sr.'s alleged fame to beer. Monk's expert admits that his report does not discuss any such connection or relationship (Ex. 24 at 89:25-90:23; 184:2-7), and Monk produced no survey or study in discovery. To the contrary, Monk's marketing employee testified that the BT brand was "a complete anomaly in the jazz world that this extensive a line … of merchandise existed with the image of any jazz musician living or deceased." Ex. 4 at 56:24-57:5.

Third, Monk has adduced no evidence that Mr. Monk Sr. is "identifiable" from the fanciful artistic work that comprises North Coast's BT beer label and that appears on the accused Beer Gear. Such recognition would be established via a survey of relevant consumers or through expert testimony—neither of which Monk has done. *See Network Automation, Inc.* at *10–11.

Fourth, Monk has adduced no evidence of "actual confusion" by members of the public. Evidence of such confusion would be, for example, competent testimony by individuals claiming they believed the goods reflected a false endorsement by Monk. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 352 (9th Cir. 1979).

Fifth, Monk has adduced no evidence of similarity of the parties' marketing channels. As with most any beer, the primary marketing channels for North Coast's Ale and Beer Gear are bars, beer distributors, on-premise displays, its brewpub in Fort Bragg, California, and "barstool to barstool" recommendations. Zelnick Decl. at ¶ 26, Ex. 25, Expert Report of Samuel J. Kursh, July 6, 2018, at ¶¶ 19, 21, 27. Monk has adduced no evidence that it markets in those ways.

Sixth, Monk has adduced no evidence that consumers of North Coast's goods would be careless in their selection, which in turn could reflect a low degree of purchaser care, and thus a greater potential for confusion. To the contrary, North Coast's industry expert has opined that craft beer drinkers are "notoriously fickle," thus reflecting considerable purchaser care. *Id.* at

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

¶ 26. Moreover, the suggested retail price of approximately $65/case is expensive for beer (Ex. 21 at NCBC000002), and as such these are not mere "impulse purchases," for which little care would be expected. See *Brooklyn Brewery Corp. v. Black Ops Brewing, Inc.,* 156 F. Supp. 3d 1173, 1180 (E.D. Cal. 2016) (plaintiff's beer is an expensive specialized beer, i.e., a Russian Imperial Stout, for which consumers would exercise care in selection).

Seventh, Monk has adduced no evidence that North Coast had a bad intent in entering the agreement with Monk. To the contrary, Monk was emphatic that Mr. Monk Sr.'s legacy has only been *enhanced* by North Coast's actions (Ex. 1 at 141:2-4; 142:23-143:10), and that North Coast's mission was "noble." *Id.* at 176:16-19. Moreover, Monk repeatedly admitted that North Coast has never done anything behind Monk's back or in secret when using North Coast's BT brand, and Monk has never had any reason to distrust North Coast. *Id.* at 92:5-12; 164:6-9. Indeed, having donated well over $1,000,000 to the non-profit Monk Institute, the only reasonable conclusion is that North Coast's aims were indeed to support jazz education.

Eighth, Monk has adduced no evidence that the parties' product lines would expand/overlap. There is no evidence Monk ever wanted, or had any opportunity, to offer a beer. Monk admitted that neither North Coast's 2006 agreement with Monk nor the failure to reach an expanded agreement with Monk in 2015 prevented Monk from entering into any deals with other entities. Ex. 19 at 30:25-31:4; 47:13-18; 68:25-69:3; 69:13-17. Moreover, Monk admitted that no acts of North Coast have caused Monk any financial harm. *Id.* at 39:4-20; 45:24-47:6, 57:13-58:5.

## D.   THE RIGHT OF PUBLICITY HAS NOT BEEN INFRINGED

To establish a right of publicity claim, a plaintiff must establish that (1) it has standing; (2) the accused use has been unauthorized; and (3) the unauthorized use is likely to cause damage. *Prima v. Darden Restaurants, Inc.,* 78 F. Supp. 2d 337, 350 (D.N.J. 2000). Monk fails on each of these elements.

### 1.   Monk Has No Standing, Because New Jersey Has Not Recognized a Post-Mortem Right of Publicity That Lasts for More Than 30 Years

Mr. Monk Sr. died in 1982, more than 35 years before the Complaint was filed in this case. FAC ¶ 8. While New Jersey does recognize a post-mortem right of publicity, neither the

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

New Jersey courts nor the New Jersey legislature has ever decided *the term* of such post-mortem celebrity rights.[20]   As rights of publicity arise under state law, the treatment by New Jersey's neighboring states is persuasive: New York[21] expressly rejects any post-mortem right of publicity. *See Pirone v. MacMillan, Inc.,* 894 F.2d 579, 585 (2d Cir. 1990). Pennsylvania recognizes a 30-year post-mortem right (*See* Pa. Ann. Stat. tit. 42 § 8316). Maryland has not recognized a post-mortem right of publicity. Virginia recognizes a 20-year post mortem right. *See* Va. Code Ann. § 8.01-40 (2011). And Delaware has not recognized a post-mortem right of publicity. For purposes of this case, it is sufficient that this Court simply find as a matter of law that the New Jersey post-mortem right of publicity does not exceed 30 years.

### 2.   The Accused Uses of Monk's Right of Publicity Were Not Unauthorized

This memorandum is replete with undisputed facts why BT Ale and Beer Gear were not "unauthorized." *See*, *e.g.*, Sections III.B.1 and 2, *supra*, Section III.G., *infra*, Section III.H, *infra*.

### 3.   Monk Admits That It Suffered No Damages

Monk has repeatedly admitted that North Coast's use of the accused name, image and likeness only *enhanced* Mr. Monk Sr.'s legacy. Ex. 1 at 141:2-4; 142:23-143:10; Ex. 19 at 39:5-19; 45:24-47:6; 57:16-58:5; 57:13-15. Critically, Monk has also admitted that no actions by North Coast have caused financial harm to Monk. Ex. 19 at 39:5-19; 45:24-47:6; 57:16-58:5; 57:13-15. Moreover, the fact that the parties did not consummate an additional agreement in 2015 (as proposed by Monk) for expanded activities did not impede or prevent Monk from entering into deals with other entities. *Id.* at 30:25-31:4; 47:13-18; 68:25-69:3; 69:13-17.

To the contrary, beginning in late 2014 and continuing through at least 2016, Monk leveraged the success of North Coast's use of the BT brand on an "extensive line of merchandise"

---

[20] Approximately half of the U.S. states recognize a post-mortem right (i.e., a continuing right after the celebrity has died), and approximately half do not. Of those states that recognize a post-mortem right, all states besides New Jersey recognize a defined term for the post-mortem right. In *Estate of Elvis Presley v. Russen,* 513 F. Supp. 1339 (D.N.J. 1981), the U.S. District Court for the District of New Jersey declined to decide the term of the post-mortem right of publicity in New Jersey, determining that this was a decision for the New Jersey legislature. The New Jersey legislature has failed to pass legislation to define the length of the post-mortem term.

McDermott Will & Emery LLP
Attorneys At Law
Menlo Park

1

2

3

4

5

6

(*i.e.*, the Beer Gear) to assist Monk in making pitches to secure additional revenue-generating deals with other entities, such as Universal Records and Jazz at Lincoln Center. Ex. 4 at 95:12-97:20; 98:11-21; 111:24-112:3; Ex. 7 at MONK07759-7760; Ex. 19 at 12:4-21; 14:9-20; Zelnick ¶ 27, Ex. 26, T.S. Monk The "EPIC" Power of the Brand! Marketing Slides (DX 76). Monk admitted that it used the fact of North Coast's "extensive" line of BT Ale and Beer Gear (without permission of North Coast) to secure more favorable royalties from third-parties. *Id.*

7

#### 4.     The Statute of Limitations Bars Monk's Right of Publicity Claims

8

9

10

11

12

13

14

The statute of limitations on Monk's right of publicity claims is two years. Cal. Code Civ. Proc. § 399(1); *see Strick v. Superior Court of Los Angeles County*, 143 Cal.App.3d 916, 924–25 (1983). California also follows the "first publication rule" to measure the statute of limitations in right-of-publicity cases from the first appearance of the accused mark on the accused physical goods. *Christoff v. Nestle USA, Inc.*, 213 P.3d 132, 137 (2009). As such, Monk cannot recover on its right-of-publicity claims in relation to uses/goods that first appeared more than two years preceding the service of the Complaint. *Id.*

15

16

17

18

19

20

As discussed in Section III.C.2, *supra*, Monk was well aware of at least most of the Beer Gear since 2009, and of the full range of the Beer Gear since *at least* 2013 (*e.g.*, when Monk encouraged the public to buy "all the wonderful things" in North Coast's online store). As explained in Section III.C.2, *supra*, North Coast did not introduce any new items of BT Beer Gear during at least the two years preceding the Complaint, nor has North Coast's BT image changed since it was introduced.

21

22

#### E.     THE MONK ESTATE'S UNJUST ENRICHMENT CLAIM FAILS AS A MATTER OF LAW

23

24

25

26

In denying the motion to dismiss, this Court recognized that unjust enrichment is not a theory of recovery or a stand-alone cause of action. ECF No. 47 at 8-9. However, this Court generously construed Monk's claim as one of quasi-contract for restitution. *Id*. Even so, Monk cannot prevail on this claim.

27

28

First, California recognizes a two-year statute of limitations on unjust enrichment claims. *See* Cal. Civ. P. Code § 338(1). Monk admits he wore the Beer Gear since 2009 and encouraged

- 22 -

the public to purchase "all the wonderful things" in North Coast's online store since at least 2013. See *supra*. at pp. 7-9. Thus, the statute of limitations bars recovery in relation to the Beer Gear, since no new item of Beer Gear was introduced within the two years preceding the Complaint. *See supra* at Section III.C.2.

Second, Monk testified that at the time he entered the 2006 agreement with North Coast, there was no fraud, coercion or mistake. Ex. 1 at 232:25-233:14.  *Cf. CRV Imperial-Worthington, LP v. Gemini Ins. Co.*, 770 F. Supp.2d 1074, 1078 (S.D. Cal. 2010) (citing *Nibbi Bros., Inc. v. Home Fed. Sav. & Loan Ass'n*, 205 Cal. App.3d 1415, 1422 (1988)).  To the contrary, Monk emphasized that North Coast always acted in good faith. *Id.* at 164:6-9, 232:13-21.

Third, a "quasi-contract" theory of recovery does not apply when there is a contract between the parties. "Where a valid express contract exists between the parties, an action based on a quasi-contract claim cannot lie when it purports to cover the same subject matter." *Reade v. CitiMortgage, Inc.*, No. 13CV404 L WVG, 2013 WL 5964611, at *6 (S.D. Cal. Nov. 7, 2013), aff'd, 633 F. App'x 409 (9th Cir. 2016). As discussed in Section III.B.2, *supra*, Monk never terminated the contract between the parties, which provided for use of the name, image and likeness "for the sole purpose of marketing and distributing the ale." As such, because the sole purpose of the Beer Gear was to market and distribute the ale, the Beer Gear was authorized since 2006. As discussed at Section III.B.3, *supra*, North Coast sold off all BT goods and ceased all accused conduct well within a reasonable time -- before any termination of the 2006 oral contract could have become effective.

Fourth, any benefit to North Coast could not be deemed "unjust." To the contrary, as agreed by the parties, North Coast faithfully sent the agreed sales-based donations to the Monk Institute since 2006. Ex. 6 at 96:20-97:1. Moreover, Monk abandoned its rights through failure to conduct any quality control (*see* Section III.C.1, *supra*), and Monk cannot terminate a consent that it granted a decade earlier without having conducted the requisite quality control (*see* Section III.B.2, *supra*). Lastly, Monk cannot seek restitution or claim injustice for acts that caused Monk no harm, and that Monk admits actually benefitted Monk. Monk exploited the fact of North Coast's extensive line of BT Beer Gear and Ale to showcase the "power of the [Monk] brand."

McDermott Will & Emery LLP
ATTORNEYS AT LAW
MENLO PARK

Monk successfully leveraged North Coast's accused (and allegedly unauthorized) action to secure lucrative licensing deals with third-parties, and to increase royalty payments from existing music licensees. *See*, *e.g.*, Ex. 4 at 53:24-54:23; 56:24-57:18; 95:20-97:12.

## F.   MONK'S CLAIMS ARE BARRED BY LACHES

California law presumes laches after the relevant statute of limitations has run. *See Jarrow,* 304 F.3d 829, 836 (citing *Brown v. Kayler*, 273 F.2d 588, 592 (9th Cir. 1959)); *Wilson v. Northwest Marine Iron Works*, 212 F.2d 510, 511 (9th Cir. 1954); *see also Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc*., 559 F.3d 985, 990 (9th Cir. 2009) ("[A] plaintiff cannot sit on the knowledge that another company is using its trademark, and then later come forward and seek to enforce its rights.") (*citing Grupo Gigante S.A. De C.V. v. Dallo & Co*., 391 F.3d 1088, 1102–03 (9th Cir.2004) (Delay of four years barred infringement claim.).

North Coast has suffered prejudice as a result of its reliance on (1) Monk's active encouragement of North Coast's sale and distribution of BT ale and Beer Gear (*see*, *e.g.*, Exs. 9 and 10); (2) Monk's wearing of the Beer Gear for more than a decade; and (3) Monk's utter lack of complaint over the course of a decade while North Coast used the accused name, image and likeness on the ale and Beer Gear. Ex. 1 at 307:21-308:3. With Monk's support and encouragement, North Coast built up its BT brand over the course of a decade, during which time its sales expanded yearly from 2006 through the filing of the Complaint. *See*, *e.g.*, Ex. 6 at 71:12-72:10; Ex. 21 at NCBC000001. Monk was well aware that North Coast was growing and expanding "exponentially" over the past decade, including investment in expanded production facilities to support its growing BT brand. *See* Ex. 1 at 177:4, 178:23-179:10; 204:9-18; Ex. 4 at 283:20-284:8; 284:24-285:8 ("[North Coast] went into extensive detail about the company's expansion plans").

## G.   MONK IS ESTOPPED TO CLAIM INFRINGEMENT

Promissory estoppel exists when there is: (1) a promise that is clear; (2) reliance by the party to whom the promise is made; (3) the reliance is reasonable and foreseeable; and (4) injury to the party which relied on the promise. *Patera v. Citibank, N.A.,* 79 F. Supp. 3d 1074, 1088 (N.D. Cal. 2015) (citing *Boon Rawd Trading Int'l Co. v. Paleewong Trading Co*., 688 F. Supp. 2d

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

940, 953 (N.D. Cal. 2010)).

Monk granted consent to North Coast via the 2006 agreement.  *See* FAC ¶ 37. Monk's actions for the past decade—by publicly praising and encouraging sales, by wearing the Beer Gear, and by failing to raise any concerns or objections to North Coast's actions—encouraged North Coast's reliance on this promise. *See*, *e.g.* Ex. 19 at 53:16-54:9, 55:17-56:1; Ex. 1 at 123:9-11, 130:8-13; Ex. 4 at 65:7-18. Indeed, Monk admits, "I let it grow." Ex. 1 at 204:20. North Coast relied on Monk's support and lack of objection to North Coast's actions as it continued to invest in growing its business, and has been injured by such reliance, having been forced to make the decision to sell-off and suspend sales of BT Ale and related Beer Gear pending the outcome of this litigation. *See*, *e.g.* Section III.G, *supra*, Ex. 8 at 21:5-24, 28:1-13.

### H.    MONK ADMITS HE ACQUIESCED TO THE ACCUSED CONDUCT

The doctrine of acquiescence "limits a party's right to bring suit following an *affirmative* act by word or deed by the party that conveys implied consent to another." *Seller Agency Council, Inc. v. Kennedy Center for Real Estate Educ., Inc*., 621 F.3d 981, 988 (9th Cir. 2010) (emphasis in original).  First and foremost, Monk actually used the words "I acquiesced" to explain why he consented to allegedly undesired use of Monk's alleged trademark.  *See* Ex. 1 at 309:16-310:9. Second, as explained in Section III.B.1, *supra*, Monk actively represented that Monk approved of the Beer Gear by (1) praising North Coast for its success related to BT, (2) actively encouraging the public to purchase "all the wonderful things" (i.e., Beer Gear) from North Coast's online store, and (3) wearing the Beer Gear.  Third, as discussed in Section III.F, Monk's delay between these representations, beginning with wearing the Beer Gear in 2009 and serving the Complaint in 2017, is inexcusable for at least the reasons set forth in Section III.F and *passim*. As explained *supra*, this delay caused North Coast undue prejudice based on, for example, its investment in growing the BT brand over the last decade and its suspension of the successful BT brand pending the outcome of this litigation. *See* Section III.F.

## IV.    CONCLUSION

For the foregoing reasons, North Coast respectfully requests that the Court enter summary judgment on all claims in favor of North Coast.

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
MENLO PARK

**MCDERMOTT WILL & EMERY LLP**

DATED: August 3, 2018          By:    */s/ Robert W. Zelnick*
                                      Robert W. Zelnick

                                      Attorneys for *North Coast Brewing Co., Inc.*